**In re UITERWYK CORPORATION, Debtor.**

**Bankruptcy No. 83–166–8P1.**

United States Bankruptcy Court, M.D. Florida, Tampa Division.

Feb. 29, 1988.

Frank E. Hamilton, III, Tampa, Fla., for claimants.

Don Stichter, Tampa, Fla., for debtor.

## ORDER ON APPLICATION FOR PAYMENT OF ADMINISTRATIVE EXPENSE OF MULTIPLE CLAIMS FOR WAGES, SALARIES

ALEXANDER L. PASKAY, Chief Judge.

THIS IS the saga of a wayward ocean-going vessel, the Victoria U, which, unlike the legendary Flying Dutchman was not guided by Captain Vanderdecken but by Cairan Graham and unlike the Flying Dutchman was not circling the Cape of Good Hope but, on the contrary, sailed in a totally opposite direction from its ultimate destination and arrived at a port which was never contemplated to be a destination when the journey began. As a matter of fact, the only similarity between the two ships is that the former was operated by Dutchmen and the latter by a family-owned corporation whose principals are also of dutch ancestry.

The matter is presented for this Court's consideration upon the Application for Payment of Administrative Expense of Multiple Claims for Wages and Salaries filed by Cairan Graham, captain of the vessel Victoria U and some officers and crewmen totaling seventeen in number. The claimants assert that their claims for unpaid wages are entitled to be accorded cost of administration status pursuant to § 503 of the Bankruptcy Code and, in turn, first priority treatment pursuant to § 507(a)(1) of the Bankruptcy Code. If the claims asserted by the claimants are recognized, full payment of their claims would be necessary as

a condition precedent to confirmation of a plan of reorganization submitted by Uiterwyk Corporation (Debtor). The claimants assert a right to payment for unpaid wages in different amounts and for different time periods. All these claims total $61,687.56.

It is the position of the Debtor that none of the claimants are entitled to any payment, let alone to be recognized as administrative claimants simply because they were not authorized to perform any services on behalf of the Debtor past January 28, 1983, the date the Chapter 11 Petition was filed.

The evidence as established at the final evidentiary hearing reveals the following facts which are pertinent and germane to the resolution of the issues involved.

The Debtor is a Florida corporation and was, at the time pertinent, engaged as a general shipping agent and operator of ocean-going vessels. In this connection it was the Debtor's business to charter vessels, book miscellaneous cargo, engage the crew and to pay all attendant expenses to accomplish the mission which, of course, included the payment of wages to the crew. On this particular journey, the Debtor chartered the ocean-going vessel Victoria U, owned by Beryl Shipping Corporation, a vessel registered in Liberia and sailing under the Liberian flag. The cargo transported on this particular journey which consisted of mixed cargo was also booked by the Debtor. It is without dispute that the Debtor engaged the services of the crew, including the services of Captain Graham who was placed in charge of the Victoria U. The arrangement between the Debtor and the crew was memorialized by contracts for each member of the crew entitled Labor Contract (Claimants' Exhibit # 1) which specified the rate of compensation of the crew. Cairan Graham is a citizen of Ireland and the crewmen are citizens of several different countries, primarily countries located on the African continent. The journey involved in this controversy originated in New York and was destined to terminate in Duala in the state of Camaroon.

The claimants had difficulty almost from the beginning of the journey to receive timely payment of their wages.

On January 31, 1983, the home office of the Debtor was sent a telex, apparently addressed to Mr. White who appears to have been a representative of the Debtor on the West Coast of Africa. (Debtor's Exhibit 2). In the message the home office stated that Uiterwyk Corporation went into a voluntary liquidation on January 27 and was granted the protection of the courts against USA creditors. The message also stated that the allotments for the crews of several ships operated by the Debtor, including the Victoria U, have not been paid since October and the crews of the vessels will be protected by the owners of the vessels and they will have a first lien on the vessels for unpaid wages in the event the vessels are disposed of and will be paid. While Captain Graham denies that this message was ever relayed to him it is not unreasonable to infer that he was in fact advised of the contents of the message, especially in light of the fact that the Debtor's representative, Mr. White, was, no doubt, in contact with the Victoria U at least when the vessel ultimately berthed in the port of Monrovia in the State of Liberia on February 4, 1983.

On February 2, 1983, the following transactions took place between the Victoria U and the home office. First, the home office, in the message addressed to Captain Graham, instructed the Captain to proceed at once to Monrovia; that the vessel and the cargo were insured only for the voyage directly to Monrovia; that the failure to carry out the orders would hold the Captain directly responsible for the ship and cargo and he would be arrested at any other port to which he may proceed for piracy. The message further stated that if the crew refused to obey his orders they will be held guilty of mutiny and will be arrested. The message restated again that the wages of the crew were fully protected by a first lien on the Victoria U and the Debtor's agent has been instructed to assist the Captain of the Victoria U to obtain full payment of his salary and the unpaid wages of the crew. In addition, the message relayed an assurance that the payment of the crew in Monrovia would take

place upon arrival. In conclusion the message also stated that any other action by the Captain and the crew would create havoc and result in arrest. (Claimants' Exhibit 4). This message appears to be a response to a previous message sent on the same date by Captain Graham to the home office followed up by a telephone call to Jan Uiterwyk who, at the time, was an officer of the Debtor corporation and was in charge of the shipping operation. In these communications, Captain Graham informed the home office that he cannot proceed to Monrovia until all outstanding wages are paid to himself and to the crew, in addition to the wages due to Captain Maddison. (Claimants' Exhibit 5). It appears that the Captain Maddison mentioned in the message was, at least at one time, an employee of the Debtor, operating as an agent for the Debtor on the West Coast of Africa. The next message also bears the date of transmittal and is addressed to the home office by Captain Graham in which Captain Graham informed the home office that the crew is unwilling to go to Monrovia unless it received a written confirmation of receipt of U.S. dollars. (Claimants' Exhibit 6). The last communication between the Victoria U and the home office was a cable message from the home office addressed to Captain Graham directing Captain Graham to proceed forthwith to Monrovia and warned the captain that if he failed to comply he would suffer severe consequences. At the time this last message was received, the Victoria U already left the port of Abidjan, located in the State of Ivory Coast, and was heading north in an opposite direction from the contractually determined and authorized destination, i.e. Duala in the State of Camaroon located south of Abidjan. It appears that Captain Graham, upon receipt of the last instruction, decided to comply with the instruction of the home office and turned the vessel around and sailed toward the port of Monrovia. However, because of lack of berthing place anchored the Victoria U first in the open sea on February 2, and it was not until February 4 that he actually moved into the port and berthed the Victoria U in the port of Monrovia. (Debtor's Exhibit 3).

Shortly after the arrival of the Victoria U at Monrovia, Alpha Lines West Africa (Alpha Lines) obtained an arrest warrant for the seizure of Victoria U and posted a bond with the Supreme Court of Liberia in the amount of $1 million. It appears that Alpha Lines had an unspecified claim against the Debtor and the Victoria U. After service of the warrant, Captain Graham informed the home office, by cable, that because of the Debtor's failure to furnish the funds necessary for the payment of the wages due the officers and the crew they were no longer willing to remain on board the Victoria U awaiting the result of the court proceedings. The message by Captain Graham also informed the home office that unless, by Friday, February 18, settlement was reached on their claims, the officers intended to make their own way home but would continue to press their claims against the Victoria U in the courts of Monrovia. Captain Graham also informed the home office that he was no longer in the position to give any "undertaking" (sic) concerning the security of the vessel and the cargo. (Debtor's Exhibit 5). Apparently this was the last communication between the Victoria U and the home office.

It further appears that Captain Graham and the crew decided to press their unpaid wage claims against the vessel but not having had the funds to post the bond required under Liberian law, requested Alpha Lines for its permission to join under the bond posted by Alpha Lines in order to file their claim against the Victoria U. Alpha Lines agreed and Captain Graham and the crew formally presented their claims in the Supreme Court of Monrovia. It appears that at the conclusion of the hearing on the claims, the Supreme Court of Monrovia ordered the Victoria U to be sold on March 25 to satisfy the claims against the vessel not only of Alpha Lines but also the wage claims of Captain Graham and the crew.

Notwithstanding of the fact that under Liberian law the unpaid wages of seamen, including the wages of the officers and the captain, are granted a first lien on the Victoria U, Captain Graham decided to dis-

obey the instructions received from the home office and did not wait for the scheduled sale of the Victoria U but left the port of Monrovia on March 10, heading north toward Dakar. The circumstances surrounding the departure of the Victoria U is shrouded in mystery and the only explanation furnished by Captain Graham was that Alpha Lines, the very creditor who caused the arrest of the Victoria U, obtained the necessary clearance and documentation for the Victoria U from the Liberian Port Authority which permitted the Victoria U to leave the port. The Victoria U, after having passed Dakar, sailed north toward Gibraltar, without stopping, and upon entering the Mediterranean proceeded due east to Tripoli, Lebanon. Upon arrival, the Victoria U was arrested again and directed to proceed to Beirut, Lebanon.

Although it does not appear from this record when the first time Captain Graham contacted the cargo interest in New York there is no question that he was in contact with the cargo interest and negotiated with Donovan, Maloof, Walsh and Kennedy, the law firm representing the cargo interest in New York for the purpose of obtaining the funds necessary not only to cover the expenses of repatriation of himself and the crew but also apparently to obtain as much of the unpaid wages as appeared to be possible under the circumstances. Be as it may, Captain Graham arrived at an agreement with the law firm whereby the cargo interest agreed to pay Captain Graham 18,-000 U.S. dollars to be transmitted to Mr. George Sahiouni, an agent of the cargo interest, to be held in escrow by him and to be paid to Captain Graham upon the full discharge of the cargo. Some of the funds agreed to be paid were designated as payment for the repatriation expenses of Captain Graham and the crew of the Victoria U. In addition, the law firm further agreed to pay Captain Graham and the crew an additional sum representing a percentage of the value of the cargo equal to the same percentage as USD 18,000 bore to the invoice value of the cargo. The law firm also agreed to pay for all expenses necessary to provision the ship, including the diesel oil needed to operate the ship

tackles during the time needed to complete the discharge of the cargo. Lastly, the law firm also agreed, on behalf of the underwriters, to indemnify and defend and hold harmless Captain Graham for any financial liabilities for having discharged the cargo at Beirut. (Debtor's Exhibit 7). In exchange Captain Graham agreed to cooperate with the operation to discharge the cargo and maintain a working crew necessary to assist the discharging operation. The agreement was executed on April 29, 1983.

It appears that pursuant to the agreement the cargo was in fact discharged from the Victoria U in the port of Beirut. Although there is nothing in this record as to what happened after the cargo was discharged in Beirut, it appears the cargo was ultimately delivered to Duala, Cameroon, the port originally designated as the end of the journey of the Victoria U.

Upon the discharge of the cargo, Captain Graham departed for Ireland and the remaining members of the crew, several of them citizens of Liberia, also returned to their homeland. Some of the crew members, as noted earlier, had already left the Victoria U in Monrovia although it appears that they were replaced by others and by June 8 the entire crew, including Captain Graham, left the Victoria U whose fate is unknown although it appears that she was in fact sold in abstentia on March 25, 1983 pursuant to the order of the Liberian Supreme Court of Monrovia.

This is basically the factual scenario on which the claimants, Captain Graham and the crew, base their claims for unpaid wages and most importantly claim to be entitled to be paid as a cost of administration of this Chapter 11 pursuant to § 503 of the Bankruptcy Code and to be accorded first priority pursuant to § 507(a) of the Bankruptcy Code. The claimants tacitly admit as they must that they were never authorized by the Debtor to leave Monrovia, on the contrary, it is clear that they were expressly prohibited to leave Monrovia. Thus, any services they might have rendered to the Victoria U after March 10 were clearly not services rendered on be-

half of the Debtor and, without doubt, furnished no benefit to the estate of the Debtor. From the foregoing it is evident that the services rendered and the costs of the alleged services did not represent the actual and necessary costs and expenses of preserving the estate of the Debtor as is required by § 503(a) of the Bankruptcy Code. *See, In re Subscription Television of Greater Atlanta,* 789 F.2d 1530 (11th Cir.1986). Having realized this, the claimants nevertheless contend that they are entitled to administrative priority of their unpaid wages and services rendered after commencement of this Chapter 11 case which is a recognized item allowable as cost of administration pursuant to § 503(b)(1)(A). To further bolster this claim it is the contention of the claimants that on the date of the commencement of the Chapter 11 case their employment contracts (Claimants' Exhibit 1) were executory in nature; the contracts were never rejected by the Debtor, even as of today, and for this reason they were deemed to have been assumed by the Debtor therefore the Debtor cannot escape its legal liability to pay the wages of Captain Graham and the crew at the rate fixed in the respective contracts.

At first blush, this argument sounds superficially persuasive since it is without dispute that these contracts were in fact executory and they were never rejected by the Debtor. Thus under the applicable legal principles they are technically deemed to have been assumed and remain in force even as of today. However, the argument does not bear close analysis and obviously under the facts of this case would produce a totally absurd result. This is so because if the proposition is accepted it would hold a Debtor liable for unpaid wages of a captain and the crew for a period during which the services they performed were clearly not services performed on behalf of the Debtor but, on the contrary, totally in defiance of the express direction and prohibition of the Debtor. The evidence is uncontradicted that the Debtor informed Captain Graham in no uncertain terms that if the Victoria U left Monrovia, he and the crew would be arrested for piracy and the crew would be held liable for mutiny for disobeying the orders of the Captain and would be subject to arrest in any port to which they might bring the Victoria U. It needs no elaborate discussion to point out that whatever was done by Captain Graham and the crew after March 10 when they left Monrovia did not benefit the Debtor one iota and whatever services were performed by the Captain and the crew was performed in the interest of the cargo interest and not the Debtor. The contention that these services were rendered in order to protect the interest of the Debtor finds scant if any support in this record and the evidence on this point it, at best, equivocal if not totally, non-existent.

This contention is based on the proposition that the Victoria U left Monrovia albeit contrary to the specific instructions of the home office in an effort to protect the ship and the cargo which if lost would have exposed the Debtor to substantial claims thus, so contend the claimants, their efforts produced some benefits meaningful to the Debtor. To point out the absurdity of this proposition, one need only to restate the undisputed facts established in this record which clearly show that Captain Graham was informed by the home office that if the ship left Monrovia the ship and cargo would no longer be insured. In addition, one should not speculate that to sail contrary to specific prohibition by the Debtor to a strange land such as Lebanon, embroiled in constant, political turmoil could possibly have been intended to serve the interest of the Debtor. On the contrary, it placed the Victoria U and cargo in serious jeopardy which, in turn, could have exposed the Debtor to a very substantial liability in the event the ship and cargo was lost, even greater than what might have occurred if the Victoria U remained in Monrovia as directed by the home office. Disregarding for a moment the contention of the claimants that they were never informed and never knew that the Debtor was in a Chapter 11 reorganization, a fact not accepted by this Court, it is clear that any entitlement to unpaid wages should be limited to the wages earned and unpaid prior to the

commencement of the case as general unsecured claims and only the wages earned post-Petition from January 28, 1983, the date the petition was filed up to March 10, the date of the unauthorized departure of the Victoria U would be entitled to administrative priority pursuant to §§ 503 and 507(a) of the Bankruptcy Code.

Accordingly, it is

ORDERED, ADJUDGED AND DECREED that the Application for Payment of Administrative Expense of Multiple Claims for Wages and Salaries be, and the same is hereby, granted in part and denied in part. It is further

ORDERED, ADJUDGED AND DECREED that counsel for the Debtor and for the claimants shall submit a Stipulation as to the amount of wages earned by Captain Graham and the crew between January 28, 1983 and March 10, 1983. It is further

ORDERED, ADJUDGED AND DECREED that the balance of the claim for unpaid wages for Captain Graham and the crew which accrued subsequent to March 10, 1983, be, and the same hereby is, disallowed.